## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 04-RB-1384(CBS)**

OWNER-OPERATOR INDEPENDENT DRIVER ASSOCIATION, INC.,
SHANE PAUL,
STEVEN BUSSONE,
DALE STEWART,
WILLIAM MECK,
WALT WILLIAMS,
JEFF MATHEWS, and
RICHARD LEE SISEMORE,

On behalf of themselves and others similarly situated.

Plaintiffs,

v.

USIS COMMERICAL SERVICES, INC. d/b/a DAC SERVICES, an Oklahoma corporation,

Defendant.

---

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY

---

USIS Commercial Services, Inc. d/b/a DAC Services ("DAC") moves for summary judgment on all Plaintiffs' remaining claims, Counts II & III.   Plaintiffs have failed to show that any of their individual consumer reports are inaccurate or that there are any systematic problems with the reporting system.   Plaintiffs have pursued theoretical analyses which avoid and conflict with any real world application and study and which cannot inform the court if any specific item of information is inaccurate. Secondly, Plaintiffs have failed to show that any transmission of information by a DAC customer via the Termination Record Form ("TRF") to DAC for storage is a consumer

report.   Rather, all TRFs in this case fall within the transactions and experience exception of definition of a consumer report under the Fair Credit Reporting Act ("FCRA").   As such Plaintiffs' case should be dismissed in toto.

## I.   UNDISPUTED FACTS  THE DAC REPORTS

1.     Charles Dees began, in the early 1980s to develop a product that would help trucking companies better communicate about past employment of drivers they were hiring. (ATH - N, Dees' Depo., p. 16-20; p. 77, L 10-12).[1] This project produced the TRF which when joined together creates DAC Reports.   The major problem at the time was that some drivers did not disclose prior employers, and they could "hide" employers they did not want contacted.  (Id., p. 39, LL 2 – 14).

2.     Dees worked two to three years to develop the TRF.  (ATH - N, p. 45, L 24 – p. 46, L 6).   Dees hired people with experience in the motor carrier industry to interview carriers to learn what they wanted in such a report and what terminology to use.  (Id., p. 23, LL 2 – 5; p. 25, L 25 – p. 26, L 21).   Dees met with the American Trucking Association and other groups to survey them for input. (Id.,  p. 33, LL 9-20; p. 56, LL 14 – 17).   He also created a "user group" to advise DAC regarding what should be in the report. (Id., p. 48, LL 4 – 18).

3.     The information contained on the TRF is owned by the company supplying the information and DAC simply stores it. (Id., p. 31, L 18 – p. 32, L 6).

4.     Dees learned that there was a wide range of companies within the motor carrier industry and their businesses were very different and that a "one size fits all" format would not work.  (Id., p. 47, LL 11-21; p. 49, L 16 – p. 50, L 16).  So the TRF was flexible.

---

[1]        Referenced items are found in Attachments ("ATH") as noted.

5.      Dees believed It was impossible to create a workable narrative report (Id., p. 98, LL 22 – 24), but Dees learned that judgment was needed in creating the TRF.  If too much detail was placed in the TRF, the companies would not use it.  (Id., p. 93, L 24 – p. 24, L 10).

6.      The TRF was designed to provide basic information (a "pointer file") about a driver and then the user would call the former employers, whose contact information was on the report, to inquire about: "What does this mean?"     (Id., p. 51, LL 1-17; p. 55, LL 6 - 11;  Ferguson[2] Depo. ATH - O, p. 50, LL 9-20; p. 148, LL 18-21;  Wimbish's[3] Dep., ATH – R. p. 25, L 6 – p. 26, L 2; p. 93, LL 6-23).

7.      Over the years carriers have used the DAC Report as it was designed as a "pointer file" to alert them to issues that they should inquire about with the former employer. (Wimbish Depo., ATH - R, p. 93, LL 6 – 23; p. 94, LL 13-22; Kuehl Depo., ATH – P, p. 111, L 15 – p. 112, L 21; p. 177, L 17 – p. 178, L 11;  Hosty Depo., ATH – T, p. 82, L 17 – p. 83, L4; paragraph 8 of Affidavits of Pacific Shipping & Trucking (ATH – B) and Midwest Coast Transport (ATH – C); paragraph 12 of Affidavit of CR England (ATH –D); paragraph 7 of Affidavits of Waller Truck (ATH – E) and Heartland Express (ATH- H); and paragraph 9 of Affidavit of Marten Transport (ATH-G).

8.      The DAC Report was designed to contain work related information. (ATH-N, p. 76, LL 14-24).   The work record contains experiences of the employer with the employee. (Gaffin Report, ATH – FF, p. 8).  It contains information that carriers want,

---

[2]      Ferguson joined DAC Services in 1986 and has worked with the DAC Report since that time (19+ years) (Depo., p. 7, ATH – O, LL 8-10).

[3]      Wimbish joined DAC Services in 1987 and served as its President from 1991 to 2003. (Depo., ATH – R, p. 5, LL 18-21; p. 8, LL 6-11; p. 11, LL 6-7).

(Tynes Depo., ATH – S,  p. 91, L 24 – p. 92, L 22).   The work record items are issues common to the carriers who use the report. (Id., p. 93, LL 13-19).

9.      DAC has never been aware of any systematic carrier or accuracy problems with the report.  (ATH - N, p. 66, LL 4 – 8; p. 70, LL 1-10).    In 18 years Ferguson never saw an issue that suggested that the database needed to be audited (ATH - O, p. 162, LL 13-22) nor has he observed the over use of categories by carriers (Id., p. 169, L 2 – p. 170, L 10).

10.     DAC provides background screening to 90% of the of the nation's top 200 truck load carriers (long haul) and to approximately 2,500 other generally large motor carriers. (ATH – A,  Aff., ¶19)

## INDIVIDUAL PLAINTIFFS

### SHANE PAUL.

11.     Shane Paul ("Paul") is a driver with employment history records at DAC. (Paul Deposition, ATH – Y,  Exhibit "B").

12.     Paul has never contacted DAC to dispute anything in his report. (Id., p. 41, LL 2-8).

13.     At his deposition, Paul disputed the entry of "cargo loss" entered by Progressive.  (Id., p. 28, LL 20-21; p. 106, LL 1-11).

14.     Paul does not dispute the entry of "satisfactory"  by Progressive.  (Id., p. 28, LL 17-19).

15.     Paul knows of no adverse action taken against him by any employer due to his report. (Id., p. 26, LL 7-14; p. 103, L 21 – p. 104, L 3).

16.    Paul admits that he did have a cargo loss while employed at Progressive consisting of empty beer cans destined for a bottling plant flying out of his trailer at the time of being unloaded. (Id., p. 30, L 7 – p. 31, L 9).  He admitted that "some amount of to-do" was made of the incident. (Id., p. 30, LL 21 – 22).

17.    Paul admitted that he signed consents for his employers to provide TRFs to DAC. (Id., p. 101, L 19 – p. 102, L 12;  Exhibit "E")

18.    Paul admits that he has suffered no damages from his past employers providing TRFs to DAC. (Id., p. 103, LL 9 – 18).

### STEVEN BUSSONE.

19.    Steven Bussone ("Bussone") is a truck driver with employment history records at DAC. (Bussone Depo. ATH - L, Exhibit "G").

20.    Bussone has never contacted DAC to dispute anything in his report. (Id., p. 18, LL 5-11)

21.    Bussone has not suffered any damages as a result of his report. (Id., p. 40, LL 4-7).

22.    Bussone has suffered no damages because employers have provided TRFs to DAC. (Id., p. 45, LL 10-14).

23.    Bussone speculated that two companies did not hire him due to his DAC Report, (Id., p. 11, L 19 – p. 13, L 2).  However, records disclosed that these companies never ordered a DAC Report on him.  (Id., p. 13, L 20 – p. 14, L16; Exhibit "H").  Bussone agreed that he had no evidence to support that these companies ever saw a DAC Report regarding him. (Id., p. 13, L 10 – p. 15, L 5)

24.    Bussone signed consents for employers to provide TRFs to DAC. (Id., p. 42, L 19 – p. 44, L 5; Exhibits "E, J and I")

**DALE STEWART.**

25.    Dale Stewart ("Stewart") is a driver with an employment history at DAC. (Stewart Depo., ATH - Z, Exhibit "O").

26.    Stewart testified that he did not see anything that was inaccurate in his DAC Report. (Id., p. 59, LL 5-16).

27.    Stewart does not dispute the listing of "satisfactory" in his report. (Id., p. 68, LL 11-15)

28.    Stewart admitted that he consented to his past employers providing TRFs to DAC. (Id., p. 26, L 6 – p. 30, L 5; Exhibits "E and N")

29.    Stewart has admitted that he knows of no damages caused by his Report (Id., p. 60, LL 17-22; p. 87, LL 1-6), or any problem because of his Report. (Id., p. 41, LL 6-9)

30.    Stewart admitted that he has suffered no harm from employers sending TRFs to DAC. (Id., p. 86, LL 22-25)

**WILLIAM MECK.**

31.    William Meck ("Meck") is a driver with employment history at DAC. (Meck Depo., ATH – I, Exhibit "E")   This record includes one employment record with Heartland Express. (Id.)

32.    Heartland initially listed "discharge" for reason for leaving; eligible for rehire "No"; and "company policy violation" in the work record, with a discharge date of March 2001.

33.    Meck admits that he was fired by Heartland Express because they believed that he had taken fuel without paying for it. (Id., p. 30, LL 2-10).   Further, Meck admitted that he was identified as one of the drivers taking fuel via two sources/investigations. (Id., p. 56, L 3 – p. 60, L  23) and that Heartland fired eleven other drivers on the same day for the same offense. (Id., p. 32, LL 12-21).

34.    Meck disputed his record with DAC in February 2004 (three years after he was fired (lease terminated) by Heartland).  As a result of his dispute the term "company policy violation" was deleted and the term "other" was added to the work record section. (Id., p.  80, LL 3-12; Exhibit "H").

35.    Meck admitted that the entry of "discharged" is accurate.  (Id., p. 81, LL 12-15)

36.    Meck admitted that the reporting of "eligible for rehire – No" is accurate. (Id., p. 81, LL 16-21)

37.    Other than the terms "discharge" and being listed as not eligible for hire, Meck admits that he sees nothing else that is negative in his report. (Id., p. 81, L 25 – p. 82, L 2).

38.    Meck admitted that his statement of dispute in Exhibit "H" is what he requested DAC to add.  (Id., p. 76, LL 14-23).

39.    After his lease was terminated in 2001 by Heartland, Meck applied with Kelly Trucking and was employed by them. (Id., p. 39, LL 13 – 16).  Meck still works for Kelly. (Meck Depo., p. 16, LL 13-14)

40.    Meck states that Kelly hired him even though they saw the report showing the Heartland information. (Id., p. 62, LL 21-24).

41   Meck has not applied with any other company after leaving Heartland. (Id., p. 39, LL 13-16).

42.   Meck states that he was concerned that others might not hire him due to his Heartland report, but he never applied elsewhere to determine whether his concern was legitimate. (Id., p. 39, LL 16-21).

43.   Meck's dispute with company policy violation was not based on any carrier's misunderstanding of the terms.   In fact, he admitted that if Heartland's report were accurate, i.e. he took fuel, then using "company policy violation" would be accurate. (Id., p. 43, L 24 – p. 44, L 2)

44.   When Heartland changed its record as a result of Meck's dispute, it was their intention to provide a neutral work record.   (ATH – F - Heartland Affidavit, paragraph 5).

**WALT WILLIAMS.**

45.   Williams ("Williams") is a driver with an employment history at DAC. (Williams Depo., ATH – H, Exhibit "F").

46.   Williams has never contacted DAC to dispute any entry in his DAC Report. (Id., p. 108, L 13 – p. 109, L 3; ATH - A, ¶12)

47.   During his deposition, Williams "disputed" the entry of "quit under dispatch" by Midwest Coast Transport. (Id., p. 86, LL 1-8).   However, Williams admitted to doing the same. (Id., p. 86, LL 9-11), and the event was confirmed by Midwest. (ATH - C, ¶ 3).

48.   During his deposition Williams "disputed" the entry of abandonment listed by C.R. England as "unauthorized location without notice" (Id., p. 85, LL 2-22).

However, Williams admitted to doing such. (Id., p. 49, L 3 – p. 54, L 25). Williams testified that when he left CR England he had a "feeling" that they would list "abandonment" because "everyone else got their equipment back" when he had left other employers. (Id., p. 112, LL 3-8)

49.     Williams could offer no evidence of any adverse action taken against him as a result of entries in his DAC Report.  (Id., p. 95, LL 11-14; p. 118, L 3- p. 120, L 4). Williams admitted getting jobs with the disputed entries in his report.  (Id., p. 55, LL 1-13; p. 57, L 13 – p. 58, L 22).

50.     Williams consented to his employers providing TRFs to DAC. (Id., p. 71, LL 10-21).

**JEFF MATHEWS.**

51.     Jeff Mathews ("Mathews") is a driver with an employment history at DAC. (Mathews Depo., ATH – J,  Exhibit "B").

52.     Mathews worked Waller Trucking four times.  After his last employment, Waller entered the following among other information in his DAC Report: "Late pickup/delivery"; "Disconnected tracking device" and listed a form of abandonment as "company terminal without notice". (Id. Exhibit "B").

53.     Mathews disputes these three entries (Id., p. 95, LL 14-18).

54.     Mathews contacted DAC to dispute his record with Waller. DAC investigated the dispute and Waller verified the above disputed items as accurate. (ATH - A, ¶12;  ATH - E, ¶4;  ATHC - J, p. 67, L 23 – p. 68, L 4, ATH – J, Exhibit "G").

55.    Mathews admitted that Waller believed that he did have late pickups/deliveries and admitted that he had been "written up" for such violations while he was employed with Waller. (Id., p. 24, L 18 – p. 25, L 15).

56.    Mathews admitted that he did abandon his load at Waller's company terminal without notice. (Id., p. 29, L 9 – p. 30, L1; p. 31, LL 12-18; p. 32, L 22 – p. 33, L 9).

57.    Mathews admitted to the unauthorized use of funds as he was given a check by Waller for $100.00 as extra pay to remain with a load in Dekalb, Ill., but instead he took the money and did not stay as requested. (Id., p. 34, LL 15-24).

58.    Mathews has obtained every job he has applied for after leaving Waller the last time. (Id., p. 19, LL 16-18); and the  Report did not prevent him from getting a job. (Id., p. 17, LL 17-19).

59.    Mathews admitted that he signed consents for his employers to furnish TRFs to DAC.   (Id., p. 42, L 14 – p. 44, L 6; Exhibits "D & E").

60.    Mathews admitted that he had no damages arising from former employers providing TRFs to DAC. (Id., p. 75, L 19 – p. 76, L 12).

**RICHARD SISEMORE.**

61.    Richard Sisemore ("Sisemore") is a driver with an employment history at DAC. (Sisemore Depo., ATH – AA, Exhibit "D").

62.    Sisemore has previously contacted DAC to dispute the entries by Pacific Shipping & Trucking. (Id., p. 70, Exhibit "E").    He disputed the entries of: "late pickup/delivery" in two employment periods. (Id., p. 74,LL 4-16;   p. 80, LL 2-11); a

"equipment loss" (Id., p. 74, L 24 – p. 75, L 1) and "personal contact requested" (Id., p. 80, LL 12-18) and that he was "discharged". (Id., p. 79, LL 24-25).

63.    Sisemore admitted that he did have late pickups/deliveries but defended his dispute by stating that he had no more lateness than anyone else. (Id., p. 74, LL 4-16; p. 80, LL 2-11).

64.    Sisemore admitted that he had an equipment loss. (Id., p. 75, L 24 – p. 76, L 10;  See Also ATH - B, ¶3).

65.    Pacific confirmed the late pickup/delivery and described the time sensitive nature of their business and Sisemore's chronic lateness problems. (Id., ¶3).

66.    Pacific had stated that Sisemore's chronic lateness problems escalated when he would disappear to gamble while traveling through the State of Nevada and would leave his loaded trailer unattended.  Pacific also noted a problem with alcohol. (Id., ¶4).   Sisemore has admitted to leaving his load to go gambling.  (ATH - AA, p. 80, LL 22-25).

67.    Sisemore has no evidence to suggest that his DAC Report has ever caused him not to get a job. (Id., p. 53, LL 13-17; p. 53, L 25 – p. 56, L 19; p. 57, LL 9-21; p. 63, L 2 – 65, L 14; p. 68, L 2 – p. 69, L 8).

68.    Sisemore has not been working for quite awhile because he has been building a home for his parents.  (Id., p. 19, LL 21-23;  p. 61,LL 19-22).

69.    Since Sisemore contacted DAC about his dispute, he has not sought employment as a truck driver. (Id., p. 34, LL 16-20).

## TRANSFER OF INFORMATION TO DAC

70.    DAC provides a form for its customers to use to obtain the driver's consent for the employer to obtain information from DAC and to permit the employer to provide information via a TRF to DAC and in turn for DAC to provide the information to other carriers, e.g. ATH - Y, Exhibit "E".

71.    The named Plaintiffs were all familiar with the consent and executed them routinely as a part of the application process with motor carriers. (ATH - Y, p. 101, L 19 – p. 102, L12; Exhibit "E"; ATH - L, p. 42, L 19 – 44, L 5, Exhibits "E, J & I"; ATH - Z, p. 26, L 6 – p. 30, L 5, Exhibits "E & N";  ATH - J, p. 42, L 14 – p. 44, L6, Exhibits "D & E";  ATH - H, p. 71, LL 10-21).

72.    As noted in Facts #18, 30, 60 & 67 above, the individual Plaintiffs could not identify any damage to them based upon their former employers transmitting a TRF to DAC for storage.

73.    No Plaintiff has indicated any adverse item in their DAC Report as something other than a transaction or experience between them and their former employer.

## II.  ARGUMENT

## DAC REPORTS DO NOT SUFFER FROM
## ANY SYSTEMATIC INACCURACIES

It is undisputed that the Defendant never intended that the DAC Report  would communicate any specific event.  Rather, it is simply a "pointer file" that alerts the user to issues that may be of interest and the user contacts the former employer to ask "what is this about?"  The nature of the report is obvious on its face.  (See Exhibits to ATH – A)  However, Plaintiffs contend that this format does not comply with the FCRA.

Plaintiffs contend that a narrative is needed to communicate the underlying facts in order to be a "complete and accurate" report under 15 U.S.C. §1681e(b) and that a TRF must be a comprehensive, employee evaluation to comply with §1681e(b).  This is an issue of law that can be decided by a motion for summary judgment.

**DAC will address the general contentions of the Plaintiffs as presented through their five experts.**

**Professor Dulebohn** opined that the report is bad because users might provide different meanings to the various terms. (Dulebohn Depo., ATH – K, p. 61, L 18 – p. 62, L 10).  Dulebohn first denied that there is any indication that users of a DAC Report call the furnisher of the information to learn the facts. (Id., p.135, LL 12-24), but then he admitted that such information was, in fact, in his file.  (Id.. p.135, L 25 – p. 136, L12). He then admitted that if the users were calling and asking something like: "what did you mean by?" This was a great way to eliminate misinterpretations or misunderstandings. (Id., p. 116, L 19 – p. 119, L 15).   Since it is undisputed that carriers do, in fact, ask such questions (Fact No. 7), Dulebohn's concerns are clearly misplaced and  irrelevant.

**Professor Schiappa** opined that the categories in the report were ill-defined and as such there was a potential that there could be miscommunication of information. (Schiappa Report, ATH – CC, p. 22).  However,  it is undisputed that drivers are not hired or rejected based upon a DAC Report.  (Tynes Depo., ATH – S,  p. 115, L 18 – p. 116, L 1).  Mr. Tynes is an expert on motor carrier hiring practices.  He is audited motor carrier hiring records for thirty-four years (Id., p. 179, LL 4-22);  he has examined hundreds of thousands of driver files. (Id., p. 32, LL 1-17).   He sees the DAC Report as being used simply as a "tool", "pointer" for the employer to use to call the old employer.

(Id., p. 33, L 20 – p. 34, L 4; p. 40, LL 21-25; p. 63, LL 6-22).   He has confirmed the use of the DAC Report as a pointer by reviewing carriers' notes of the contacts with former employers in the driver's files. (Id. p. 34, L 22 – p. 35, L 2).   This use of the report is not accidental as it was designed solely to be a pointer file. (Fact Nos. 6 & 7).   Professor Schiappa's concerns are unfounded.

Professor Schiappa has no knowledge of the communication between carriers. (Schiappa Dep., ATH – V, p. 167, LL 10-17).   Rather he chose to stay in a theoretical world and did not conduct any studies to determine if any of his assumptions about the Report were correct.  (Id., p. 34, L 24 – p. 35, L 6;  p. 22, L 15 – p. 23, L 7).   Any study would have easily shown Professor Schiappa that there were universal communications regarding the report.   Also lost in Plaintiffs' position was that just because there was something derogatory in a report, that did not translate into a loss of a job because the issue reported by a prior employer may not be important to the hiring company.  (Kuehl Depo., ATH – P, p. 133, LL 2-14).   Proving this statement to be true, in fact, Plaintiffs have found jobs despite negative information in their Reports. (Fact Nos. 15, 40, 49, 58 & 67).

**Professor Beamer** is the keystone for Plaintiffs' analysis of the DAC Report.  His opinions are meaningless and wholly theoretical.   First, his analysis of the TRF does not even attempt to analyze it but rather he creates a new format that it is an employee evaluation which is attempting to measure several characteristics of a driver that he thinks DAC should measure.  (Beamer Report, ATH – BB, p. 10-11; Beamer Depo., ATH- M, p. 108, LL 18-23).   This is like analyzing a car as a truck.  The car will not measure up well as a truck and a TRF, which is not an evaluation, will not measure up

14

to being a good one. This is a classic straw man argument. The TRF was not designed to be an evaluation. (ATH - A, ¶8); further, DAC has resisted suggestions that it attempt to evaluate drivers in its reports.   (Id., ¶9). Neither do the users of the report see it as an evaluation.  (ATH - G, ¶9;  ATH - F, ¶7;  ATH - E, ¶7;  ATH - E, ¶12; ATH - B, ¶8; ATH - C, ¶8)

Beamer goes on to measure the TRF as if it were an evaluation.   First, he uses the concept of Cronbach's Alpha[4] and then after determining that this was not an appropriate formula. (ATH - BB, p. 43), he decided to use a social studies formula of KR-20.   However, KR-20 only measures how well a group of responses match a goal, subject or "construct".    It does not measure the factual correctness of individual answers.  The chart on page 44 of Beamer's report provides an excellent example of what is wrong with Beamer's approach.   The form wants the scorer to check "yes or 1" in each of the boxes.   The greater number of yeses the higher the KR-20 score will be and thus under that formula the greater internal reliability.  (ATH - M, Exhibit "17").   If all the answers were "No or 0" the score would be miserable, i.e. low reliability.  However, the fact that the answers are "No" does not tell us whether the answers were accurate. They may be completely accurate. (Id., p. 284, LL 2-22)  The "Nos" would simply indicate that the "evaluation/instrument/survey" was not drafted well enough to capture what the supervisors were believed to observe the employees doing.   Using this formula, Beamer then concludes that 60% of the TRFs are inaccurate "!".   (ATH - BB, p. 50).   He is wrong on this point even if the TRF was an employee evaluation.  His only creditable source for this conclusion was Carmines and Zeller, Reliability and Validity Assessment. (See Exhibit "GG" attached hereto).  That publication, at page 45,

---

[4]        A formula to measure the internal consistency "validity" of a survey.

noted that Crombach's Alpha/KR-20 analysis only provides a range of reliability and the number derived is the "lower bound" of the reliability.  Under this analysis we would only know that the internal consistency/reliability TRF as between 100 to 40% reliable.  We know nothing about the accuracy of any item.    This is not very helpful.  Moreover, Beamer could not tell whether any "inaccuracy" helped or hurt a driver. (ATH - M, p. 186, L 2 – p. 187, L 18; p. 249, LL 4-19).

Working in an factual vacuum, Beamer did not know what carriers do when they fill out the TRF. (Id., p. 89, L 8 – p. 90, L 3);   he did not know how the information is used (Id., p. 165, L 9 – p. 167, L 14);  he did not know whether the information was adequate for the user, (Id., p. 150, L 8 – p. 151, L. 3);  he did not know how companies read a DAC Report, (Id., p. 184, LL 22-25).    As such he has no idea if any user is "confused". (Id., p. 91, L 22 – p. 92, L 14);  Beamer expected that each category in the work record section should be addressed on each TRF so that he could measure his own created subjects/"constructs". (ATH - BB, p. 49)   What he failed to realize was that on this particular form, the driver does not get to take the "whole test".  If a driver incurs one, two or three infractions, it is likely he is fired.  (Michael Depo., ATH – U, p. 151, L 11 – p. 152, L 17).   This fundamental error by Beamer is astonishing.   Beamer who is a political science professor with some statistical background in political polling is clearly out of his element in this area. (Id., p. 173, L 17 – p. 174, L 25).   Beamer has no idea if any particular TRF/DAC Report is inaccurate. (ATH – M, p. 201, LL 14-17; p. 202, L 19; p. 204, L 6).  Further, he has admitted that his statistical methods would not tell the court whether any specific item in any TRF was incorrect. (Id., p. 246, LL 2-15).

**Mr. Pearch** is a consultant who advises companies on management processes. (Pearch Depo., ATH – X,  p. 25, LL 2-17).  He knows nothing about consumer reporting agencies. (Id., p. 25, L 18 – p. 27, L 3; p. 62, LL 9-14), and he has no background with the FCRA. (Id., p. 27, LL 9-14).  He has no idea of whether the DAC database information is inaccurate. (Id., p. 13, LL 12-19; p. 40, L 25 – p. 41, L 17; p. 61, LL 9-13; p. 65, LL 11-15).  Bottom line, Pearch thinks that DAC processes could be better but does not know whether the current process creates inaccurate reports under the FCRA. This is not helpful.

Finally, **Professor Belzer** was retained to calculate damages.   Belzer has accepted Beamer's and Schiappa's opinions at face value that the DAC data are inaccurate. (Belzer Depo. ATH – W, p. 101, L 12 – p. 102, L 23).   He calculated damages for drivers who have one of six work record categories or lack of satisfactory in their work records regardless of whether the information in the report is true or not. (Id., Depo., p. 16), or whether the inaccuracy helps the driver, i.e., excludes negative information.   He calculates such damages in spite of his own knowledge that drivers are hired regardless of the negative selections on their DAC Report because of the severe driver shortage.  (Belzer Rep., ATH – DD, p. 95, L 18 – p. 96, L 11).   Amazingly, he admitted that he did not have any information about the actual affect that a DAC Report has on a driver. (ATH - W, p. 221, LL 11-25).

Plaintiffs' experts are nothing more than expensive wrapping around naked speculation that some DAC Reports "may be" inaccurate.  These experts attack the processes and procedures not the factual accuracy.  It is clear that Plaintiffs' approach is to remain theoretical in order to give the appearance of class wide issues, but these

"experts" cannot identify a single report that is factually incorrect.   Further this effort is an attempt to "wire around" the court's dismissal of Counts I & IV as these experts attack procedures and seek to declare them deficient and ignore the true accuracy of any report.   As will be shown in the next section, this analysis is backwards and irrelevant.

### III.   PLAINTIFFS HAVE FAILED TO PROVE THAT ANY DAC REPORT IS INACCURATE.

Plaintiffs' inaccuracy claims falls within 15 U.S.C. §1681e(b).   In order to recover the Plaintiffs must prove:  i) the consumer reporting agency failed to follow reasonable procedures to assure the accuracy of its report; ii) the report in question was, in fact, inaccurate; iii) the Plaintiffs suffered an injury;   and,   iv) the consumer reporting agency's failure of reasonable procedures caused the Plaintiffs' injury.   *Cassara v. DAC Services*, 276 F.3d, 1210, 1217, 1226 (10th Cir. 2002);   *Philbin v. Trans Union Corp.*, 101 F.3d, 957, 963 (3rd Cir. 1996).  In *Cassara* the 10th Circuit made it clear a plaintiff must prove that the defendant failed to follow reasonable procedures which resulted in an inaccurate report that caused injury.   See also, *Graham v. CSC Credit Services, Inc.*,  306, F. Supp. 2nd,  873, 878 (D. Minn. 2004).  The Plaintiffs never connect their theories regarding poor design, procedures, etc.  to any actual factual inaccuracy, much less any actual damage to any driver.

Plaintiffs' analysis is directed only to DAC's procedures.   Under the FCRA, procedures are irrelevant unless there is an inaccurate report.   If the report is accurate, then the procedures utilized by the consumer reporting agency to create the report become irrelevant.  *Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994); *Cahlin v. GMAC*, 936 F.2d 1151, 1156 (11th Cir. 1991); *Equifax v. FTC,* 678 F.2d 1047

(11th Cir. 1982); *Tinsley v. TRW, Inc.*, 879 F. Supp. 550, 552 (Dist. MD. 1995), aff'd. 64

F3d 659 (4th Cir. 1996); *Wadley v. Equifax,* 396 F. Supp. 2d 677, 679 (W.D. Va., 2005).

In *Equifax, Inc. v. FTC, supra.*, the court found that *Equifax* procedures were flawed, but

there were no inaccuracies that hurt the consumer only those that helped the consumer.

Thus, there were no violations of the FCRA. *Id.* p. 1052.

To be inaccurate under the FCRA, the information must be patently incorrect or

misleading so it can be expected to have an adverse affect on the consumer. *Dalton v.*

*Capitol Associated Industries, Inc.*, 257 F.3d 409, 415 (4th Cir. 2001). Here, Plaintiffs

have pointed to no inaccuracy, let alone one that could have an adverse effect. Nor

have they factually identified any instance where any information was actually reported

in the wrong category or that there is a factual basis to establish that there is confusion

as to where events are to be reported. Rather, Plaintiffs allege that DAC Reports are

inaccurate/incomplete because it utilize categories rather than a narrative, it is not a

"comprehensive evaluation" and/or that carries do not report events at the same rate,

thus, they assume that users must be confused about the selections they make. It is

Plaintiffs' burden to prove the connection. *Cassara,* p. 1226, fn. 20.

The FCRA is a consumer protection act not a user protection act. As such,

accuracy relates to an incorrect reporting that damages the consumer. Hence, the

necessity for damages. See, *Equifax v. FTC,* 678 F.2d 1047, 1052 (11th Cir. 1982). In

this case the court noted that the only inaccuracies that were found were in favor of the

consumer and as such no violation of the FCRA occurred. If a report is "inaccurate"

because of a defaulted loan or a cargo loss is omitted on the report, the consumer is not

damaged. The user may be disappointed but the consumer is given a "better than

should be" report.   Further accuracy is measured on what is reported because not all information must be in a report.   *Swanson v. Central Bank & Trust Co.,* 2005 W.L. 1719363 (E.D. KY); *Davis v. Equifax,* 346 F. Supp. 2d 1164, 1171-2 (N.D. Ala., 2004).

The use of categories by DAC has been implicitly approved by the 10th Circuit in *Cassara*.   At page 1225 of the Opinion, the Court expressly discussed that customers need to speak the same language so that the information may be reported in <u>categories</u> about which there is common understanding and agreement.   Here, DAC publishes a Guide describing events that will fall into each category.   (ATH - A, ¶10)   The terms in the Report follow industry usage.  Here the Plaintiffs have presented no direct evidence that there is not a common understanding of these categories.   There is no evidence that someone is reporting "log violation" in "no show" or "other".  Rather, Plaintiffs avoid reality and theorize that there must not be a common understanding because companies report information at different rates. (Schiappa Depo., p. 42, L 13; p. 45, L 19).    However, there are many factors that can account for such reporting patterns. (See, Ferguson Aff., Ex. D to Motion in Liminie to Exclude Schiappa Testimony) but Plaintiffs avoid exploring those.   Other courts have stated that reports that direct the user to the source of information are not "incomplete" or "inaccurate" as they do not mislead the user and such reports are in many cases reasonable under the FCRA. *Koropoulos v. Credit Bureau, Inc.,* 734 F.2d 37, 45 (D.C. Cir. 1984).   A narrative report was rejected as useful for several reasons: i) hard to understand; ii) unwanted information; iii) require excessive verification; iv) generally, people do not write well; and, v) the user would still have to call.   (ATH - N, p. 45, L 24 – p. 46, L 6; p. 49, L 16 – p. 50, L 6; ATH - R, p. 35, LL 8-16;  ATH - O, p. 148, LL 11-17; p. 150, LL 13-19).

One myth that Plaintiffs have advanced is that for terms to be understood all companies must report all events at the same rate/percentage. However, that is literally impossible. There are over 2,500 members providing information to DAC at any one time. Each company is unique. Employment law recognizes that different decision makers make different decisions on the same facts and such does not violate the law. Furr v. Seagate Technology, 82 F.3d, 980 (10th Cir. 1996) Each company has its own standards of what is important and their cultures will affect how events are valued and how information is reported. (Michael Rep., ATH – EE, p. 5; Gaffin Rep., ATH – FF, p. 6; ATH - N, p. 48, L 25 – p. 49, L 21).   The users know that when companies report information it is important to them but not necessarily important to the user.   (ATH - P, p. 133, LL 2-14; ATH - N, p. 48, L 25 – p. 50, L 6).   What DAC strives to do is to insure that when any carrier reports a "cargo loss", for example, it fits within guidelines and if any other carrier experiences a "cargo loss", it reports it as a "cargo loss" rather than in some other category.   In *Cassara*, the 10th Circuit was concerned that the same experiences might be being reported as accidents but could also have been reported as "other".   *Cassara* at pp. 1224 – 1225.   Under §1681e(b) consumer reporting agencies are only required to use "reasonable" procedures.   Plaintiffs' demand that all employers conform to a single nationwide standard and thus evaluate all events the same is not only unreasonable, it is impossible.     In its context, any potential harm to a driver caused by mis-categorization of an event on a report is eliminated by the fact that decisions are not made from the DAC Report itself. (ATH - S, p. 115, L 18 – p. 116, L1; ATH - N, p. 123, LL 10-18).   Rather, users call the former employers and ask why they listed something on the report. (Fact No. 7)   Thus, if an event was misidentified, the

conversation will clear up this point and the driver will not suffer any damages due to any miscommunication.

In compliance with §1681e(b) of the FCRA, a consumer reporting agency may accept and report information it receives from a source without independently investigating its accuracy so long as it is creditable on its face and the source is believed to be reliable.  16 CFR Part 600 Comment to §607A;   *Casella v. Equifax Credit Information Services*, 56 F.3d 469, 474 (2nd Cir. 1995) (consumer reporting agency had no duty to reinvestigate information prior to being notified by consumer that there was a dispute); *Cushman v. Trans Union Corporation*, 115 F.3d 220, 225 (3rd Cir. 1997); *Anderson v. Trans Union*, 345 F. Supp. 2d 963, (W.D. Wis., 2004) (a consumer reporting agency may rely upon the information received unless the consumer has alerted the agency that the source is unreliable, or the agency knows the information may be unreliable).  There is no evidence in this case to suggest that DAC was advised prior to receipt of any of Plaintiffs' disputes that there was any to doubt about the information furnished by the various carriers or generally that there were systematic problems with the data.  Plaintiffs, **Paul, Bussone and Williams** never contacted DAC to dispute any information.   Plaintiff, **Stewart**, did not contact DAC nor did he see anything inaccurate in his report.   (ATH - Z, p. 59, LL 5-16).   At the deposition of **Paul**, he admitted that his report was accurate. (Fact Nos. 13 and 14).   **Bussone's** report contained no derogatory information. (ATH - L, Exh. "G"); however, **Williams** who did not dispute anything until his deposition, admitted that although he disputed information in the report, he did, in fact, quit under dispatch with Midwest Coast. (Fact No. 50) and he had an abandonment with CR England. (Fact No. 51).   Thus, while information was

disputed, in truth, it was not.  This leaves three Plaintiffs who did dispute their Reports with DAC, **Meck**, **Mathews** and **Sisemore**.

In regard to **Meck**, his record was changed from company policy violation to "other" when he disputed it and he does not see this to be negative. (Fact No. 40).  He admits that he was discharged and he is not eligible for rehire.  Thus, these are accurate. (Fact Nos. 38 and 39).  He has not applied for a job since he contacted DAC. (Fact Nos. 42 and 43).  In like manner Plaintiff, **Mathews**, has not sought employment since he contacted DAC to dispute his file with Waller. (ATH - J, p. 18, L 17 – p. 19, L 5).  Finally **Sisemore** testified that he has not sought employment after contacting DAC either. (Fact No. 72).  Thus for **Meck**, **Mathews** and **Sisemore** no report has been provided by DAC since they "advised" DAC that they disputed the information.   Thus, they have no claim under §1681e(b).

When **Meck**, **Mathews** and **Sisemore** contacted DAC, it conducted timely investigations.   In such investigations the former employers verified the disputed information or the information was deleted. (ATH - A, ¶12;  ATH - F, ¶5; ATH - B, ¶¶ 3 & 4; ATH - E, ¶¶2-5).

When DAC receives a dispute it contacts the employer and advises it of the driver's dispute and requests information to support the selection by the employer. (Miller Depo., ATH – Q, p. 38, L 4 – p. 39, L 3)   The DAC Report deals with the opinions and judgments of an employer about an employee. (ATH – P, p. 171, L 9 - p. 172, L 24)   When reviewing the decisions of employers, courts do not act as a "super personnel department that second guesses employer's business judgment".   *Sims v. Oklahoma Department of Mental Health and Substance Abuse Services*, 165 F.3d

1321, 1330 (10th Cir. 1999).   In like manner, once a carrier presents its rationale for its decision, it is not the consumer reporting agency's ("CRAs") prerogative to substitute its own judgment for that of the employer so long as that employer can articulate an event that falls within the category that was selected on the Report.   At that point, the disputed item is deemed verified.  The FCRA contemplates that a CRA is not a finder of fact and that some disputes will not be resolved.  15 U.S.C. §1681i(b).   In this case, **Mathews'** dispute of "disconnecting tracking devise" is such an example.  Mathews claims he didn't do it, and his employer says he did.  (ATH - E, ¶4)   In this case, the employer verified the information.  It appears from the record that Heartland attempted to appease **Meck**. (Fact No. 47)    Meck was a plaintiff in a class action against Heartland. (ATH - I, p. 45, L 19 – p. 46, L 17)    This was obviously a very sensitive situation for Heartland.  Changes for such purposes in a report are not evidence of inaccuracy. *Cahlin v. GMAC,* 936 F.2d 1151, 1158-9 (11th Cir. 1991).

Of the seven named Plaintiffs, only three have ever disputed their record with DAC, and those Reports were verified as correct or truly disputed by the parties and reported that way.  Plaintiffs have presented only their unsupported assertion that any entry was wrong.   As shown most disputes are not genuine because the plaintiffs tend to admit that they did what was listed in the report even if they "dispute it" because they do not like seeing it on their Report (ATH - A, ¶13).

## IV.  PLAINTIFFS HAVE NO DAMAGES AND CANNOT RECOVER UNDER §1681e(b)

None of the named Plaintiffs have demonstrated that they have been damaged by the procedural deficiencies outlined by their experts.  No one has been shown to be confused and drivers and employers seem to know the reason behind each entry

discussed.   Each item was listed in the appropriate category.  If the system were as flawed as the experts opine one would believe that OOIDA could have found at least one (1) plaintiff that was damaged by such flawed procedures, but there are none before the court.  Even if any of the Plaintiffs were to prove that they had a report that was inaccurate,  it is still their burden of prove to show that the complained of procedure caused their damage.  *Cassara v. DAC, supra*, p. 1226, fn 20; *Dalton v. Capitol Associated Industries, Inc.*, 257 F.3d 409, 416 (4th Cir. 2001).  None of the Plaintiffs suffered damages as the result of a DAC Report (Facts Nos. 15, 21, 30, 40, 41, 49, 58 and 67).  Without damages any §1681e(b) claim fails.  It goes without saying OOIDA could not suffer damages.

Here Plaintiffs, at most, show that they disagree with their former employers. That fact does not reflect upon the procedures of DAC.   There is no indication that an employer misreported information due to confusion on the form of the TRF etc.   There is simply a disagreement between the employer and employees of the most common sort.    No Plaintiff has shown to be damaged by any procedure of DAC and their individual and class claims must be dismissed.

## V.    TRFs ARE NOT CONSUMER REPORTS

While this Court stated in its Order on the Motion to Dismiss that information supplied to DAC in a TRF may be a consumer report, there was no ruling that, in fact, TRFs are consumer reports.  In fact they are not and Plaintiffs have not proven that any are.  It is difficult to pinpoint the exact violation of the FCRA that DAC has supposedly violated by reading the Amended Complaint.  The claim is unlawful procurement and use which would be covered by §1681q – a criminal statute.  Plaintiffs do not assert

claims against the alleged carrier CRAs.  DAC will attempt to address the key issues in the claim.

While Plaintiffs allege that DAC was a "user"; however, it is obvious that DAC is a CRA and does not "use" the information in conjunction with any interaction with the consumer.  In fact, all DAC does is to accept the TRFs for storage.  (Fact No. 2)  The records belong to the carrier.  This is no different than the carrier handing the TRF to a file clerk who puts it in a cabinet.  DAC simply puts it into an electronic cabinet.  There the TRF sits unseen and unused until a prospective employer obtains the consumer's consent and requests the record.  Thus, is there really a transfer of information at this stage subject to the FCRA?

The basic issue is whether the FCRA even applies to this transaction.  The elements of the claim would be that: i) the furnisher is a consumer reporting agency; ii) it provides a consumer report; iii) to someone without a permissible purpose and/or that someone failed to obtain to the consumer's consent to release the information; and iv) the consumer suffered adverse action/damages.

The Plaintiffs in this case, routinely consent to their employers providing TRFs to DAC.  (Fact Nos. 16, 25, 29, 52 & 61)   Plaintiffs' claim fails for two reasons: First, there is no evidence that any TRF is a consumer report and secondly, the Plaintiffs have not suffered any damages as a result of such storage of TRFs.    Plaintiffs' claim that the transfer is a "adverse action" against them.  However, that term is specifically defined by the FCRA.  §1681a(k)(1)(B)(ii).   In the context of this case adverse action is limited to: denial of employment or other decisions for employment purposes that adversely affects any current or prospective employee. DAC is not hiring drivers so no adverse action by

it. The named Plaintiffs, when asked, could not identify any damages or adverse action occurring to them as a result of ex-employers storing information with DAC. (Fact Nos. 21, 32, 52 & 63)   No Plaintiff has affirmatively demonstrated that they have suffered any adverse action as defined by the FCRA or suffered any damages.

In its Motion to Dismiss DAC argued that the TRF was not a consumer report because of the transactions and experiences exceptions to the definition of a consumer report found at §1681a(d)(2)(A)(i).   Plaintiffs have not presented any evidence that any of their reports contain information not covered by this exception. This exception is not as narrow as Plaintiffs would urge. For example, a testing laboratory's report falls within this exception even though it had no direct contact with the consumer and that it received the specimen from a third party. *Hodge v. Texaco, Inc.*, 975 F.2d 1092, 1096 (5th Cir. 1992).   Further, information gathered during an investigation falls within this exception. *Salazar v. Golden State Warriors*, 124 F. Supp. 2d 1155, 1158-9 (N.D. CA. 2000). (Recently employment investigations have also become exempted from the definition of consumer report in §1681a(x)).   Even reports on consumers when the source only believed their account was with the consumer fall within this exception even though they had no experience with the real consumer. *Lewis v. Ohio Professional Electronic Network, LLC,* 190 F. Supp.2d 1049, 1060 (S.D. Ohio, 2002); *Smith v. National Bank of Atlanta*, 837 F.2d 1575, 1578 (11th Cir. 1998).   Further, courts recognize the appropriate roles of the CRA and those that furnish information to it.   The later are not CRAs.   *DiGianni v. Sterns*, 26 F.3d 346, 349 (2nd Cir. 1994).   Here, the Plaintiffs' TRFs clearly, under any definition, contain only the information that is either a transaction with or an experience with their former carrier. **Paul**: a cargo loss for the

company that entered the record. (Fact No. 15). **Bussone**: no derogatory information. **Stewart**: no derogatory information. **Meck**: accused of stealing fuel from his employer. (Fact No. 33). **Williams**: "quitting under dispatch" and abandoning a load. Obviously, both dealing directly with his employer.   **Mathews**: refused to arrive at a shipper's location as instructed by his employer and thus had late pickup and delivery. (Fact No. 57); he abandoned his load at the carrier's terminal. (Fact No. 58); the locating device was on his carrier's equipment. (ATH – E, ¶4)   **Sisemore**: late picking up and delivering loads for his carrier. (Fact No. 65 & 68); he damaged his carrier's equipment. (Fact No. 56)   Obviously, the company would be the one firing him. All of these incidents fall within the exceptions to the definitions of a consumer report as these are their experiences with these drivers and Plaintiffs have no cause of action. As for a class action Plaintiffs have failed to establish that any TRF contains information from a third party. Such an action cannot proceed on pure speculation.

## IV.   CONCULSION

Plaintiffs have failed to demonstrate that any report on the named Plaintiffs or any other driver is factually inaccurate and they failed to demonstrate that they have suffered any damages as a result of any report issued by the Defendant. Secondly, they have failed to show that the TRFs are consumer reports or that they have suffered any damages as a result of the transfer of information from their former employers to the Defendant. Therefore, USIS Commercial Services, Inc. is entitled to Summary Judgment on Counts II & III and Plaintiffs' case should be dismissed.

Respectfully submitted,

Richard L. Harring
GRIMSHAW & HARRING, P.C.
1700 Lincoln Street, Suite 3800
Denver, Colorado  80203

/s/_____
Larry D. Henry
BOONE, SMITH, DAVIS, HURST & DICKMAN
500 ONEOK Plaza, 100 West 5th Street
Tulsa, OK 74103

Dan Barney
SCOPELITIS, GARVIN, LIGHT &
HANSEN
1850 M Street N.W. Suite 280
Washington, D.C. 20036-5804

Robert L. Browning
Russell Jay Taylor, Jr.
SCOPELITIS, GARVIN, LIGHT & HANSEN
10 W. Market Street, Suite 1500
Indianapolis, IN  46204-2968

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via e-mail and electronic filing, this _____ day of December 2005 to:

Paul D. Cullen, Sr., Esq.
Paul D. Cullen, Jr., Esq.
Randall Herrick-Stare
The Cullen Law Firm PLLC
1101 30th Street, NW., No. 300
Washington, D.C.  20007

By ____/S/_____