**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No: 04-RB-1384 (CBS)**

**OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.,
SHANE PAUL,
STEVEN BUSSONE,
DALE STEWART,
WILLIAM MECK,
WALT WILLIAMS,
JEFF MATHEWS, and
RICHARD LEE SISEMORE,
on behalf of themselves and all others similarly situated,**

      **Plaintiffs,**

**v.**

**USIS COMMERCIAL SERVICES, INC., /d/b/a DAC Services, an Oklahoma
corporation,**
      **Defendant.**

---

### MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY
---

Under Rule 56 of the Federal Rules of Civil Procedure, the Owner-Operator

Independent Drivers Association, Inc. ("OOIDA"), Shane Paul, Steven Bussone, Dale

Stewart, William Meck, Walt Williams, Jeff Mathews, Richard Lee Sisemore

(collectively, "Plaintiffs"), individually and on behalf of all others similarly situated,

request that this Court enter an order granting partial summary judgement that under

the Fair Credit Reporting Act  I) DAC willfully failed to satisfy the prerequisites for

obtaining consumer reports from consumer reporting agencies, and II) DAC willfully

1

published inaccurate consumer reports.

**Undisputed Facts Relevant to Both Claims**

The undisputed facts applicable to both claims are: 1) DAC designed the

Termination Record Form ("TRF") as a means of gathering statements about drivers

from previous employers.[1] 2) Statements about drivers may be communicated to DAC

by "computer, fax, or mail."[2] 3) Employment History Reports[3] ("EHRs") contain the

statements about drivers previously submitted on TRFs[4] by previous employers. 4)

EHRs are "consumer reports."[5] EHRs are sold by DAC to prospective employers for

employment purposes, 5) when selling EHRs reports DAC is a "consumer reporting

agency;"[6] and, 6) drivers are "consumers."[7]

**I.   DAC Willfully Failed to Satisfy the Prerequisites for Obtaining a Consumer
Report from a Consumer Reporting Agency.**

**A. Elements of the Claim.**  Plaintiffs have the burden of proof on all of the elements

of this claim. Plaintiffs must demonstrate that undisputed facts support the conclusions

that: a) TRFs about drivers procured by DAC from motor carriers are "consumer

reports;" and b) DAC failed to perform any one of three separate requirements of 15

U.S.C. §1681b(b) before procuring them: 1) make a disclosure to the driver that it will

---

[1]See Ex. A; Ex. E at 65-66; Ex. P.

[2]Ex. E at bates number USIS00229.

[3]See e.g. Ex. O.

[4]See Ex. C; Ex. D.

[5]See Ex. A at ¶¶ 1-2; Ex. E at 8, ¶ 1.

[6]15 U.S.C. § 1681a(f).

[7]15 U.S.C. § 1681a(c).

obtain a TRF about him; 2) obtain the written authorization of the driver to obtain a TRF about him; and, 3) certify to the motor carrier submitting the TRF that it has performed these requirements, and c) DAC committed these violations willfully.

Statements about transactions solely between the reporter and the consumer are excluded from the definition of "consumer reports" by 15 U.S.C. §1681a(d)(2). The application of this exclusion is in the nature of an affirmative defense with respect to which DAC carries the burden of proof. DAC can not carry that burden because a) it has not pled the affirmative defense, and b) statements in TRFs either implicate transactions with third persons, or are ambiguous.

This motion does not address, and leaves for the jury, the following elements of damages that are separately applicable to both of the claims in this motion: the number of individual violations suffered by the proposed class, the value of between $100 and $1,000 for each willful violation of the FCRA,[8] and alternately, whether DAC's violations of the FCRA were the result of "negligence."

**B. Standard of Law**

**Definition of "Consumer Report."** Under the FCRA, a "consumer report" is any written, oral, or other communication by a "consumer reporting agency" bearing on a consumer's character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for [in this case]

---

[8]15 U.S.C. § 1681n

3

employment purposes.[9]  The use of a consumer report for "employment purposes" is

defined as its use "for the purpose of evaluating a consumer for employment,

promotion, reassignment, or retention as an employee."[10]

**The Prerequisites for Obtaining a Consumer Report**.  There are three

prerequisites for procuring consumer reports from consumer reporting agencies.

> [A] person may not procure a consumer report, or cause a
> consumer report to be procured, for employment purposes with
> respect to any consumer, unless--
> (i) a clear and conspicuous disclosure has been made in writing to the
> consumer at any time before the report is procured or caused to be
> procured, in a document that consists solely of the disclosure, that a
> consumer report may be obtained for employment purposes; and
> (ii) the consumer has authorized in writing (which authorization may be
> made on the document referred to in clause (i)) the procurement of the
> report by that person.[11]

and

> A consumer reporting agency may furnish a consumer report for
> employment purposes only if– (A) the person who obtains such report
> from the agency certifies to the agency that– (i) the person has complied
> with [the above-listed disclosure requirements].[12]

**Willfulness.**  The last element of Plaintiffs' claims under §1681b is that DAC's

violations were willful under §1681n of the FCRA.  The 10th Circuit has not established

a standard for "willfullness" under §1681n.  The Ninth Circuit in *Reynolds* recently

defined a willful act as one committed "knowingly and intentionally," not necessarily with

"malice or evil motive," but with either "knowledge or reckless disregard with respect to

---

[9] 15 U.S.C. § 1681a(d)

[10] 15 U.S.C. § 1681a((h)

[11] 15 U.S.C. § 1681b(b)(2)(i) and (ii)

[12] 15 U.S.C. § 1681b(b)(1)(A)(i)

whether the action is unlawful."[13]   Alternatively, the Fifth Circuit in *Stevens* defined a willful act as one that is committed knowingly and intentionally in conscious disregard for the rights of others, but not necessarily with malice or evil motive.[14]

### C. Termination Record Forms are Consumer Reports Under the FCRA.

This Court has found that "clearly employer motor carriers [submitting TRFs] are consumer reporting agencies" under the FCRA.[15] Plaintiff adopt by reference the statement of undisputed fact common to both claims on page 2.  It is also undisputed that the TRF provides for statements that purport to bear on a driver's character, general reputation, and personal characteristics.[16]  For example, TRF codes may be selected to report: a)  a driver's adherence to "company standards of performance,"[17] b) "unauthorized" driver actions,[18] c) a driver's failure to act,[19] d) a driver's falsification of information on an employment application,[20] e) a driver's violation of company's policy,[21] f) a driver's violation of the law,[22] and g) a catchall code 999, "Other - Anything other

---

[13]See *Reynolds v. Hartford Financial Services.*, 426 F.3d 1020, 1036-1038 (9th Cir. 2005).

[14]*Stevenson v. TRW Inc*. 987 F.2d 288, 296 (5th Cir.1993)

[15]Order Granting in Part and Denying in Part Defendant's Motion to Dismiss at 8, Docket entry 40, March 7, 2005.

[16]Ex. C; Ex. D.

[17]Ex. D, Codes 901, "Satisfactory," 902, "Superior," and 903, "Outstanding."

[18]Ex. D, Codes 940, "Disconnected Tracking Device," 957, "Unauthorized Equipment Use," 959, "Unauthorized Passenger," 961, "Unauthorized Use of Company Funds," 953, "Unauth. Location-W/O Notice,"and  955, "Unauth. Location-With Notice.

[19]Ex. D, Codes 924, "Late pick up/Deliver," 928, "No Show," and 929, "failed To Report Accident."

[20]Ex. D, Code 915, "Falsified Employment Application.

[21]Ex. D,  Code 935, "Company Policy Violation."

[22]Ex. D, Code 926, "Log Violation."

than the items listed above..."  DAC's expert, Robert Tynes testified that TRF codes are statements about the characteristics of drivers and their veracity.[23]  DAC's expert John Gaffin agreed.[24]  Each of these statements bear upon the subject driver's character, general reputation, or personal characteristics.

It is undisputed that EHRs are used for employment purposes.  DAC admits that submission of a driver's work record to DAC can "help good drivers get back to work as soon as possible and alerts other companies to drivers whose behavior is a threat to public safety."[25]  "DAC provides information to transportation-related companies...who use the information to make informed hiring decisions."[26]  Long-time DAC employee Kent Ferguson testified that the TRF was designed so that motor carriers could communicate statements about drivers to other motor carriers, and that motor carriers expect that the data they submit on a TRF will be used, at least in part, by other motor carriers to evaluate a driver for employment purposes.[27]  Accordingly, it is undisputed that the TRF is a written, faxed, or computer generated communication by a motor carrier (consumer reporting agency) bearing on a driver's, character, general reputation, or personal characteristics, that is expected to be used, is used, and is collected for the purpose of serving as a factor in evaluating the driver's eligibility for employment.  The Plaintiffs ask the Court to rule that DAC TRFs are "consumer reports."

---

[23]Ex. B at 70, lines 9-12; at 170, line 5 to 171, line 2.

[24]Ex. F at 8, lines 2-5.

[25]Ex. E at bates number USIS00230, "Transmit Immediately."

[26] Ex. A at bates number USIS00163 (OOIDA), ¶2,"What is USIS/DAC?".

[27]Ex. G at 49, lines 9-18; at 20, lines 3-16.

**D. DAC Fails to Comply With the Prerequisites for Obtaining a Consumer Report.**

Undisputed evidence establishes that DAC routinely does not satisfy any of the FCRA prerequisites before procuring TRFs.  Plaintiffs ask the Court to declare that each failure to discharge any one of the three prerequisites is a separate, individual violation of the FCRA.

**1. DAC Never Discloses to Drivers its Intent to Obtain a Consumer Report.**

Named Plaintiffs state in the attached affidavits that DAC never disclosed to them that DAC was going to procure a TRF from their previous motor carrier employer.[28] Kelli Lambert, Manager of Contractor Development for Parkway Transport, testified that a TRF is created by her secretary and transmitted to DAC without any involvement of DAC.[29]  Furthermore, neither DAC's "Driver's Guide to USIS/DAC" nor DAC's "DACPRO Product Guide" provide any evidence that DAC has a procedure by which it, at any time, notifies a driver that it intends to procure a TRF about him.  It is thus undisputed that DAC systematically violates Section 1681b(b)(2)(i).

**2. DAC Never Obtains Driver Authorizations to Receive a Consumer Report**

With respect to the written authorization prerequisite, named Plaintiffs state by affidavit that they have never communicated to DAC an authorization to procure a TRF about them from a motor carrier.[30]    DAC definitively confirms this policy of not contacting drivers before receiving TRFs in "A Driver's Guide to USIS/DAC" where it

---

[28]Ex. H; Ex. I.

[29]Ex. J at 77, line 18 to 78, line 7.

[30]Ex. H; Ex. I..

7

states "...a release is not required in order to store your employment history in the [Employment History File]."[31]  DAC employee testimony corroborates this.  DAC's former Vice President of Communication and head of Legal Coordination, Derek Hinton, who worked at DAC between 1984 and 2002, testified that it was DAC's position that it did not need the driver's authorization to receive a TRF about them.[32] DAC's former President Charles Dees agreed, adding that DAC designed the system that way.[33]  Motor carrier representatives also corroborate that lack of communication of authorization by drivers to DAC.  Kelli Lambert, Manager of Contractor Development for Parkway Transport, testified that she is not aware of any act that DAC must go through in order to procure a TRF from Parkway.[34]  Neither DAC's "Driver's Guide to USIS/DAC" nor DAC's "DACPRO Product Guide" provides any evidence that DAC has a procedure by which it, at any time, obtains permission from a driver to procure a TRF about him. DAC's admissions that it does not believe that it needs a driver's authorization to receive a TRF about him, and the corroborating evidence, is sufficient to show that DAC has never obtained any driver's authorization, and thus has violated §1681b(b)(2)(ii).

### 3.  DAC Never Certified to Motor Carriers That it Gave Drivers Notice and Obtained Drivers' Authorization to Obtain a Consumer Report

Finally, the undisputed evidence demonstrates that DAC has never made any

---

[31]Ex. A, under heading "Who can access my records..."

[32]Ex. K at 118, lines 16-24.

[33]Ex. L  at 126, lines 4-16.

[34]Ex. J at 77, line 18 to 78, line 2.

8

certification to motor carriers that DAC provided a driver notice or obtained a driver's

written authorization to obtain a TRF.  The testimony of motor carriers corroborates the

lack of such practices.[35]  By its own statement that no release is required for the

submission of a TRF, and by the corroborative testimony of motor carriers, DAC has no

practice of certifying its compliance with notice and authorization prerequisites to

obtaining a  driver's TRF from a motor carrier.

### E.  DAC has "Willfully" Violated §1681b(b).

Under either a reckless disregard or a conscious disregard standard of willfulness,

summary judgment that DAC willfully violated §1681b(b) is warranted by the undisputed

facts.  DAC's comprehensive knowledge of the FCRA is demonstrated in its "Driver's

Guide to USIS/DAC"[36] and its DACPRO Product Guide[37] for its members.  DAC

specifically instructs prospective employers screening applicants for driving jobs to

obtain permission before ordering an employment history report.[38]  DAC knows that

under the FCRA the consumer has control over the publication by DAC of the very

same information that DAC procures without notice to, permission from, or knowledge

of the consumer.  DAC's reckless disregard of its FCRA duties is evident in the

coincidence of its undisputed knowledge of the FCRA and its design of the system for

procuring TRF's without any driver involvement.  This Court should find that DAC has

---

[35]Ex. M at 32, line 22 to 33, line 1; Ex. J at 77, line 18 to 78, line 7; Ex N at 61, line 24 to 63, line 6.

[36]Ex. A.

[37]Ex. E at 8-23.

[38]Ex. E at 65, bates # USIS00229.

willfully procured consumer reports without first satisfying the conditions precedent to that procurement.

## II.  DAC Willfully Fails to Follow Reasonable Procedures to Maximize Possible Accuracy

**A.  Elements of Claim and Burdens of Proof.**  Under this second part of their motion, Plaintiffs seek a ruling on one or more of the following elements of its § 1681e claim, that DAC willfully published inaccurate consumer reports.  The Plaintiffs bear the burden of proof regarding the two elements of this claim.  Those two elements are: a) EHRs published by DAC containing at least one statement from the "Work Record" section of the TRF or containing "Eligible for rehire. No" could have been more accurate; and b) DAC's publication of consumer reports that could have been more accurate was willful, i.e. in reckless or conscious disregard for its obligations under the FCRA.  Two other damage-related elements of this claim, the number of inaccurate consumer reports published and the amount of statutory damages to be assessed are not addressed in this motion and left for the jury.

An allegation of having followed "reasonable procedures to assure maximum possible accuracy" as an excuse for having published inaccurate consumer reports is in the nature of an affirmative defense,[39] with respect to which DAC carries the burden of proof.  DAC will be unable to carry that burden: a) because DAC has not pled this affirmative defense, and b) because of the reasons set forth below regarding DAC's willful violation of FCRA accuracy standards.

---

[39]*Philbin v. Trans Union Corp.,* 101 F.3d 957 (3rd Cir. 1996)

**B. Undisputed Material Facts, Applicable to this Claim**

Plaintiffs incorporate by reference the undisputed facts common to both claims on page 2 above.  Also undisputed is that DAC designed its TRF to foreclose employers selecting Work Record descriptors on a TRF from providing thereon an explanation for its selection;[40] and DAC intended for a prospective employer to learn the meaning of the Work Record descriptors on a driver's employment history by placing a phone call to the driver's previous employers.[41]

**C.  Statement of the Law**

**Accuracy Under the Fair Credit Reporting Act.**  "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."[42]  "Maximum possible accuracy" in consumer reports serves all parties by promoting efficiency in interstate commerce and fairness to consumers.[43]

The 10th Circuit discussed at length the concept of accuracy under the FCRA in an opinion about which DAC should be intimately familiar: *Cassara v. DAC Services.*[44] The 10th Circuit approached the question of what is an inaccurate consumer report

---

[40]Ex. Q at 93, lines 1-6; Ex. W at 14 ¶ 27.

[41]Ex. Q at 49, line 8 to 50, line 23; at 51, line 3 to 52, line 1; at 69, line 3 to 70, line 14; Ex. G at 50, line 19 to 51, line 5; at 147, line 10 to 148, line 25; at 149, line 8 to 152, line 5; Ex. L at 48, line 25 to 50, line 20; at 51, lines 1-17; at 53, line 14 to 56, line 13; Ex. P at 64, line 17 to 67, line 1; Ex. R at 48, line 8 to 52, line 19.

[42] 15 U.S.C. § 1681e(b)

[43]See 15 U.S.C. § 1681.

[44] *Cassara v. DAC Services, Inc.*, 276 F.3d 1210 (10th Cir. 2002)

through concepts of "meaning" and "communication."  "In order for words to function in communication, they must *mean* something."[45]  The *Cassara* court explained at length that if a word or category is to have meaning it must be defined and limited by specific criteria.[46]  It continued that "if employers in that industry (i.e. transportation) are to communicate meaningfully among themselves within the framework of the FCRA, it proves essential that they speak the same language, and that important data be reported in categories about which there is genuine common understanding and agreement."[47] And "[w]ithout consistency [in the use of terms in the 'DAC report'], the accuracy of the reporting is cast into doubt."[48]  "If DAC is to 'insure maximum possible accuracy' in the transmittal of... data through its reports, it may be required to make sure that the criteria defining categories are made explicit and are communicated to all who participate."[49] One of the parties "who participate" in the DAC consumer reporting activities is the driver, for whom the report must also have meaning.  Other courts have addressed the criteria of completeness of description and precision in passing on the accuracy of consumer reports.[50]  The analysis of the accuracy of DAC reports is thus informed by an examination of their completeness, definition, and consistency of use

---

[45] *Cassara* at 1221, quoting Robert T. Harris & James L. Jarrett, Language and Information Logic, 113 (1956) (emphasis in original)

[46] *Cassara*, at 1220.

[47] *Cassara* at 1225.

[48]*Cassara*, at 1220.

[49] *Cassara* at 1225.

[50] *Koropoulos v. The Credit Bureau, Inc.*, 734 F.2d 37 (D.C. Cir. 1984); *Pinner v. Schmidt;*  805 F.2d 1258 (5th Cir. 1986).

12

among motor carriers.

**Willfulness**.  Plaintiffs incorporate by reference the willfulness standard on pages 4-5 above.

**Affirmative Defense: Reasonable Procedures to Assure Maximize Possible Accuracy**.

In order to establish that it followed "reasonable procedures to assure maximum possible accuracy," DAC must satisfy the criteria for such procedures endorsed by the *Cassara* court.  In its discussion of the "reasonable procedures" standard, the *Cassara* court explicates the criteria of a quality reporting system.  It endorsed the FTC's statement of the need for procedures in a credit reporting agency to promote accuracy:

> "if DAC "learns or should reasonably be aware of errors in its reports that may indicate systematic problems," then "it must review its procedures for assuring accuracy."..."If the agency's review of its procedures reveals, or the agency should reasonably be aware of, steps it can take to improve the accuracy of its reports at a reasonable cost, it must take any such steps.   It should correct inaccuracies that come to its attention." *Id.* Not only must DAC review its own procedures, it "must also adopt reasonable procedures to eliminate systematic errors that it knows about, or should reasonably be aware of, resulting from procedures followed by its sources of information," *id.,* in this case, its member employers.   DAC may require a reporting employer who frequently furnishes erroneous information to revise its procedures "to correct whatever problems cause the errors." *Id.* DAC, then, is in a position to require its member employers to report accidents according to a uniform definition that DAC may articulate.[51]

**D.  DAC Reports are Inaccurate Because They are Incomplete.**

That EHRs lack significant meaning and therefore inaccuracy is evident from their undisputed incompleteness.  The Work Record statements in the TRF, even when read

---

[51] *Cassara* at 1225, *quoting* 16 C.F.R. Part 600 App., at 508 (2000).

with their definitions in DAC's Guide to the Termination Record Form, are incomplete because they do not set forth the explicit criteria required by the *Cassara* court.[52] Because the criteria for the use of TRF codes are incomplete, their use produces incomplete statements about drivers' employment hitories.  For example, any TRF containing the Work Record descriptor "company policy violation" (TRF Code 935) does not inform any reader (either a prospective employer or a driver) what policy was allegedly violated, when, how or to what effect.  It is undisputed by DAC that company policies vary widely.[53]  A general statement that some unspecified policy was violated by some unspecified act or omission on some unspecified date at some unspecified place is, on its face, incomplete and, therefore, inaccurate.  No reader of such a statement has enough information to understand what criteria were used by the motor carrier to select that statement.  This same analysis applies to any of the Work Record descriptors.[54]

DAC intended these broad statements to do no more than set forth the general subject matter in the EHR, putting the burden on the prospective employer, if it chooses, to make a telephone call to the former employer to learn the meaning of the

---

[52] *Cassara* at 1219.

[53]Ex. P at 108, line 25 to 111, line 21; Ex. Q at 46, line 6 to 49, lines 21; at 49, line 8 to 50, line 23; at 69, line 3 to 70, line 14; at 170, line 14 to 174, line 5; at 44, line 13 to 46, line 2; at 52, line 19 to 54, line 11; at 51, line 3 to 52, line 1; Ex. G at 138, line 23 to 144, line 20; Ex. L at 62, line 1 to 64, line 2; Ex. R at 48, line 8 to 52, line 19.

[54]Ex. T at 21-24; Ex. V at 15.

Work Record descriptor or "Eligible for Rehire, No."[55] The *Cassara* court recognized

that DAC's design leaves to "employers [motor carriers] to define that scope [of the TRF

code] according to their own needs."[56]

Because TRF descriptions have, by design, incomplete criteria for their use, EHRs

created from TRFs lack meaning and are inaccurate.

### E. DAC Reports are Inaccurate Because Their Terms Lack Definition.

The lack of meaning in the contested TRF codes is inherent in the DAC-designed

TRF according to the unrebutted expert opinions of Dr. Edward Schiappa,[57] and those

of Dr. Glenn Beamer. Specifically, Dr. Schiappa opines that the Work Record

descriptors fail to convey meaning because they fail as definitions, and because they

are imprecise.

Dr. Beamer opines that the Work Record descriptors lack the capacity for accuracy

because they lack both "content validity" and "measurement validity;" those opinions

have not been disputed. "Content validity" requires that individual queries accurately

measure individual events and characteristics related to a specific dimension of an

employee's character or work history.[58] "Measurement validity is the extent to which

individual queries accurately portray the frequency of an event or the extent of a

---

[55]Ex. Q at 49, line 8 to 50, line 23; at 51, line 3 to 52, line 1; at 69, line 3 to 70, line 14. Ex. G at 50, line 19, to 51, line 5; at 147-8, lines 10-25; at 138-44, lines 23-20 at 149-52, lines 8-5. Ex. L at 48-50, lines 25-20; at 51-3, lines 1-17; at 53-6, lines 14-13. Ex. R at 48, line 8 to 52, line 19.

[56] *Cassara* at 1222.

[57]Ex. S. Ex. V at 1-16, lines 1-2, at 144-151, lines 19-1. Ex. T at 2-3, 51-53.

[58]Ex. T at 2-3

characteristic."[59]  Without content and measurement validity in the Work Record

statements, motor carriers share no common criteria for the selection of any particular

Work Record descriptor.  This echos the specific problem addressed in *Cassara*.  The

lack of definition in the contested TRF codes is compounded by DAC's decision to

make them inflexibly ambiguous, and to foreclose employers from explaining their

selection of them.[60]

   Because the Work Record statements lack definition and a shared meaning, they

are inaccurate under the FCRA.

   **F.  DAC Reports are Inaccurate Because Their Terms are Used Inconsistently**.

   DAC members' dramatically inconsistent use of the Work Record statement

demonstrates the lack of a shared meaning among motor carriers.  This is illustrated by

comparing the frequency that different motor carriers use a Work Record descriptor.

DAC produced such a frequency distribution for its expert William Coberly.[61]  In the

portion of the frequency distribution reproduced here, the TRF submissions by 34 motor

carriers each submitting between 10,282 and 123,191 TRFs to DAC are summarized.

The variation in the use of the Work Record descriptor "other" among these carriers

ranged from 0.05% of one carrier's total of TRFs, to 90.06% of another's.  Both Dr.

Beamer and Dr. Schiappa  provided unrebutted opinions that such data demonstrates

the inconsistent use of the TRF codes and is evidence that motor carriers' possess no

---

[59]Id.

[60]Ex. Q at 93, lines 1-6; Ex. R.

[61]Ex. U.

shared meaning of the Work Record descriptors.[62]  Without a shared meaning about

Work Record descriptors, the communication contemplated by the FCRA and *Cassara*

is defeated, and EHRs that contain them are inaccurate.

**G. DAC's Publication of Inaccurate Consumer Reports was Willful**.

The undisputed facts that support summary judgment that DAC willfully violated the

FCRA are a) DAC's knowledge of FCRA accuracy requirements as demonstrated in its

form contract with motor carriers[63] and its product guide,[64] together with its production of

intentionally borad and "inaccurate" consumer reports; b) DAC's design of a system that

intentionally uses incomplete, undefined, inconsistently used terms; c) DAC's knowing

since at least 1999, that drivers frequently do not know what the Work Record

descriptors mean;[65] d) DAC's policy of keeping driver's ignorant of the meanings of TRF

codes,[66] e.g. not making the Guide to the Termination Record form available to

drivers;[67] thereby interfering with the rights of drivers to check, and rebut the statements

on their DAC reports;[68] e) DAC's policy that even when a driver disputes the use of a

Work Record descriptor, and DAC is fully informed of the basis for its selection, DAC

does not inform the driver fully of what it knows;[69] f) DAC's toleration of consistent non-

---

[62]Ex. S at 25; Ex. T at 41-42.

[63]Ex. P.

[64] Ex. E.

[65]Ex. Q at 170, line 14 to174, line 15.

[66] Ex. R. at 12, ¶ 22.

[67] Ex. Q at 151, line 7 to 52, line 7.

[68]15 U.S.C. § 1681i

[69] Ex. Q at 46, lines 6-21.

compliance, as a matter of motor carrier policy, with its Guide to the Termination

Record Form;[70] g) DAC's disregard for the explicit recitation by the 10th Circuit in

*Cassara* of DAC's responsibilities to identify and attend to any systemic sources of

inaccuracies or the inconsistent use of Work Record descriptors by motor carriers[71] by

not routinely monitoring TRFs submitted by previous employers for consistent usage of

its defined terms;[72]  h)  DAC's failure to check TRFs for completeness upon their

receipt;[73] i) DAC's failure to undertake an audit of its database for accuracy or for any

other data quality purpose;[74] j) DAC's disregard for, and acquiescence in, the grossly

inconsistent use of the TRF terms among carriers.  DAC's toleration for such

inconsistency, after being specifically advised by the *Cassara* court to pay attention to

it, demonstrates DAC's  profound contempt not just for the FCRA generally, but

specifically for the pronouncements addressed to it by the Tenth Circuit Court of

Appeals.

### H.  DAC Failed to Follow Procedures to Maximize Possible Accuracy.

DAC's design of the TRF and its system for collecting TRFs, and its failure to

monitor the use of the Work Record statements by motor carriers demonstrates its

failure to follow reasonable procedures to assure maximize possible accuracy.  The

---

[70] Ex. M at 48, lines 5-9; at 52, lines 3-7.

[71]Ex. G at 95, line 23 to 96, line 5.

[72]Ex. Q at 144, line 24 to 148, line 15.  Ex. G at 95, line 2 to 96, line 5.  Ex. R at 65, line 5 to 68, line 24.  Ex. L at 65, line 5 to 66, line 24.  Ex. K at 112, line 20 to 114, line 20.

[73]Ex. Q at 13, line 1 to 15, line 22.

[74] Ex. G at 90, line 9-13, at 95, line 2 to 96, line 5.

evidence above in support of the proposition that DAC willfully violated the FCRA also

establishes that DAC can not carry the burden of showing that the lack of accuracy in

its EHPs was the product of reasonable procedures and is now a justiciable issue

regarding whether it followed "reasonable procedures."  DAC's product itself, its

admissions and those of its customers, condemn its procedures.  There are no facts

that DAC can prove to demonstrate that the level of inaccuracy found in its EHRs exists

despite its following reasonable procedures to assure maximize possible accuracy.

In summary, DAC should be found liable for its willful creation of a system that

systematically and consistently produces consumer reports that do not reflect

"maximum possible accuracy."   The damage-related elements of this claim, the

number of such EHRs and the value between $100 and $1,000 for each, is left for a

jury to decide.

## III. Conclusion

These arguments for Summary Judgment underscore the ways in which DAC's

systematic violations of the Fair Credit Reporting Act are particularly appropriate for

class-wide adjudication, as briefed in a pending motion.  Plaintiffs request that this

Court enter an order granting partial summary judgement that under the Fair Credit

Reporting Act I) DAC willfully failed to satisfy the prerequisites for obtaining consumer reports from consumer reporting agencies, and II) DAC willfully published inaccurate consumer reports.

Respectfully Submitted,

s\ Randall S. Herrick-Stare
Paul D. Cullen, Sr., Esq.
Randall S. Herrick-Stare, Esq.
Paul D. Cullen, Jr., Esq.
Amy M. Lloyd, Esq.
The Cullen Law Firm, PLLC
1101 30th Street  NW,  #300
Washington, D.C. 20007
Ph:    202-944-8600
Fax:   202-944-8611

December 30,  2005                    Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

On the 30th day of December, 2005, the undersigned served a copy of this document upon the persons listed below, by electronic means:

Larry D. Henry, Esq.
***Boone, Smith, Davis, Hurst,
and Dickman, PC***
500 Oneok Plaza
100 West Fifth Street
Tulsa, OK 74103
lhenry@boonesmith.com

Daniel R. Barney, Esq.
***Scopelitis, Garvin, Light & Hanson***
1850 M Street, NW, Suite 280
Washington, DC 20036-5804
dbarney@scopelitis.com

Richard L. Harring, Esq.
***Grimshaw & Harring, PC***
1700 Lincoln Street, Suite 3800
Denver, CO 80203
rharring@grimshawharring.com

Robert L. Browning, Esq.
Russell Jay Taylor, Jr., Esq.
***Scopelitis, Garvin, Light & Hanson***
10 West Market Street, Suite 1500
Indianapolis, IN 46204-2968
rbrowning@scopelitis.com
jtaylor@scopelitis.com

_____ s/ Randall S. Herrick-Stare _____